A06A1152. Z & Y CORPORATION v. INDORE C. STORES, INC.
(638 SE2d 760)

ELLINGTON, Judge.

This appeal arises from a dispute over the sale of a service station, the parcel of land on which it was located, and an adjoining parcel of land. Z & Y Corporation, which purchased the property, sued the seller, Indore C. Stores, Inc., for breach of contract, specific performance, fraud, attorney fees, and punitive damages. Following a bench trial, the trial court entered a judgment in favor of the seller, and Z & Y Corporation appeals, claiming the evidence did not support

the judgment. As explained below, we conclude that several of the trial court's factual findings and legal conclusions were clearly erroneous and do not support the court's judgment. Further, we find that Z & Y Corporation was entitled to specific performance of the contract as a matter of law. Therefore, we reverse the trial court's judgment and remand the case with direction for the court to enter judgment in favor of Z & Y Corporation.

Unless otherwise noted, the following facts are undisputed. Zeyde Yimam is the President of Z & Y Corporation, and Emesh Patel is the CEO of Indore C. Stores, Inc.[1] In July 2002, Patel contracted with Speedway SuperAmerica, LLC, to purchase 36 service stations in the Atlanta metropolitan area (hereinafter, the "Patel/Speedway contract"). One of the stations covered by the contract was located at "2651 Powder Springs Road, Marietta, GA," and the contract included a land description for this address which contained a metes and bounds description showing that the property included two parcels of land totaling approximately 5.66 acres. The service station is on a parcel measuring approximately two acres ("Parcel I"), and the second, larger parcel was undeveloped ("Parcel II"). The Patel/Speedway contract stated that it was to close on or before November 1, 2002. Patel planned to immediately re-sell all of the stations, and Speedway provided flyers describing the different stations to Patel so that he could market the stations to prospective buyers. Each flyer gave the size and location of a station and the surrounding property, and provided the sales price and other essential information. Patel worked with Citizens Trust Bank to arrange financing for prospective buyers. Patel planned to close on his sales to these buyers before he closed on the Patel/Speedway contract, with the effective date of the resale contracts to be delayed until the date of the Patel/Speedway closing and the proceeds from the resales remaining in escrow until that date.

In August 2002, Yimam learned that Patel was selling service stations in Cobb County, and he received a flyer describing the station and surrounding property located at 2651 Powder Springs Road ("the property"). The flyer described the dimensions of the property, stated that the property measured 246,667 square feet,[2] and listed the selling price as $1 million. Yimam and other prospective buyers met with Patel and Patel's real estate broker to discuss the purchase of the different properties. According to Yimam, one of the prospective

---

[1] At all times relevant to this litigation, Patel and Yimam acted solely as principals of their respective corporations. Therefore, for simplicity, this opinion refers to the corporate parties according to their principals: "Yimam" (the buyer/plaintiff/appellant) and "Patel" (the seller/defendant/appellee).

[2] It is undisputed that 246,667 square feet is approximately 5.66 acres.

buyers asked Patel which properties were available for sale, and Patel said, "Whatever I [get] from Speedway, I will transfer to you and I will sell it to you." Yimam also testified that, when he asked Patel about purchasing the Powder Springs Road property, Patel said he no longer wanted to sell the property for $1 million because he had received a survey that day which showed the property contained two parcels of land, not one.

After further negotiations over the following two weeks, however, Yimam and Patel reached an agreement and executed a contract for the sale of the property at "2651 Powder Springs Rd., Powder Springs, GA 30127"[3] for $1.4 million. Although the contract referred to an attached land description in "Exhibit A," the exhibit was not attached to the contract. According to the contract, the sale was contingent upon Patel "consummating the acquisition of the property and facilities from Speedway SuperAmerica, LLC." The contract provided that the closing had to occur no later than October 22, 2002, but that the effective date would be the date Patel "consummates the purchase and acquires possession of the Property from Speedway." The contract also required Yimam to apply for and secure financing from Citizens Trust Bank ("the bank"). Patel's broker submitted Yimam's personal financial statement and financing application to the bank on Yimam's behalf, and the flyer describing the property was included with the documents. The collateral to secure the bank loan included the service station and the "246M square foot lot," in other words, square footage that would equal both parcels of land.[4]

The parties scheduled the closing for October 22, 2002, and agreed that Yimam would sign the closing documents in the morning and Patel would sign the documents later the same day. Prior to the closing, Patel's attorney provided the bank's attorney, Patrice Perkins-Hooker, with a land description of the property and a title examination for the property, both of which included Parcels I and II. Perkins-Hooker prepared the closing documents based upon those documents and, on October 21, she faxed copies of the documents to Yimam to review. All of the documents, including the loan agreement, deed to secure debt and security agreement, assignment of revenue, rents and leases, owner's affidavit, and limited warranty deed, referenced an "Exhibit A" as the legal description of the property. Exhibit A was an addendum which included a legal description for "2651 Powder

---

[3] It is undisputed that this address is used for both parcels of land and that Parcel II does not have a separate address.

[4] The bank's closing attorney also obtained title insurance for the bank which covered both parcels of land.

Springs Road" and described the property as including both Parcels I and II, totaling 5.66 acres.

The next morning, Yimam went to the closing by himself and met with Perkins-Hooker and the bank's loan officer; neither Patel nor Patel's attorney was present. Yimam signed the closing documents, and Perkins-Hooker notarized his signatures. The documents were consistent with those that had been faxed the day before and referenced the same legal descriptions showing both parcels of land. During the closing, Yimam and Perkins-Hooker looked over the survey of the property, which showed both parcels of land. According to both Yimam and the loan officer, Perkins-Hooker never said anything during the closing about Yimam receiving only Parcel I instead of both parcels, nor were any questions raised about the accuracy of the land descriptions that were attached to the closing documents.[5]

Later that same day, after Yimam had left the bank, Patel signed the closing documents, including an owner's affidavit and a limited warranty deed; all of the closing documents showed that Patel was selling both parcels of land to Yimam. Patel testified that he did not read the closing documents before he signed them. Perkins-Hooker notarized Patel's signature on the limited warranty deed. After the closing, Perkins-Hooker sent copies of all of the executed closing documents to Yimam, Patel's attorney, and the bank, and all of the land descriptions attached to the documents included both parcels of land.

According to Patel, at some point after the October 22 closing but before the Patel/Speedway closing, he discovered that the closing documents showed that he had conveyed both parcels of land to Yimam. According to Patel, this was a "mistake," because he did not intend to sell Parcel II. Notably, the evidence presented was completely contradictory as to when the mistake in the land description was discovered and whether it was Patel, Patel's attorney, or an employee of Speedway who first discovered the mistake.[6] Regardless

---

[5] In fact, the loan officer specifically testified that he never learned of "any dispute or problem with regard to the amount of property that Mr. Yimam was purchasing or thought he was purchasing" until the summer of 2003.

[6] As shown in Division 2 (a), infra, Perkins-Hooker testified that Patel's attorney discovered the mistake in the closing documents during Yimam's closing on the morning of October 22. In his pre-trial affidavit, however, Patel stated that he discovered the mistake in the limited warranty deed during his closing later that afternoon, *after* Yimam had already signed the closing documents, and that he (Patel) directed Perkins-Hooker to "correct" the deed at that time. But Patel contradicted himself when he testified at trial that he had signed the closing documents without reading them. Moreover, in his deposition and at trial, Patel again contradicted the preceding evidence by testifying that *his attorney* discovered the mistake a few days after October 22, while the attorney was reviewing the documents during the Patel/Speedway

of when or how Patel learned of the mistake, Patel does not dispute that it was discovered *after* Yimam's closing and that Yimam was not present when the mistake was discovered.

The undisputed evidence also shows that, when Patel's attorney told Perkins-Hooker that there was a mistake in the description of the property sold to Yimam, Perkins-Hooker simply tore the descriptions of Parcel II from all of the closing documents. Perkins-Hooker then called Yimam and told him that there was a "mistake" in the closing documents and that Patel had sold Yimam more land than he had intended. According to Yimam, he told Perkins-Hooker that there had been no mistake and that he had purchased both parcels of land. On October 28, Perkins-Hooker sent a two-page fax to Yimam directing him to replace the land descriptions included in his copies of the executed closing documents with an "attached" copy of the land description. There was no land description attached to the fax, however.[7] Yimam never received a copy of the altered land description.

It is undisputed that neither Yimam nor Patel re-executed any of the closing documents after Perkins-Hooker altered the land descriptions. According to Perkins-Hooker, she never asked the parties to re-execute the altered documents because she did not think it was necessary, explaining that the land descriptions were in exhibits attached to the closing documents and the exhibits themselves did not require a separate signature of either party.

On October 31, Patel closed on the Patel/Speedway contract, which included his purchase of both Parcel I and Parcel II, located at "2651 Powder Springs Road, Marietta, GA." On November 4, Patel's

---

closing.

Further, in direct contrast to this evidence, one of Speedway's managers testified that a Speedway employee first discovered the mistake during the last week of October 2002, while preparing for the Patel/Speedway closing. The manager called Patel "a couple of days" before the Patel/Speedway closing and told him that Speedway had made a mistake in the legal description of the property in the Patel/Speedway contract, and that Speedway did not intend to sell Parcel II to Patel. According to Speedway's manager, Patel and his attorney told him that Patel was selling the property "the same way [he was] buying from [Speedway]. And that . . . it's just a wash through. And therefore, [Patel needed] to proceed with the transaction as Speedway presented [the property descriptions in the sales contract]." The manager also testified that Patel told him that the land descriptions could not be rewritten at that point because he was already in the process of re-selling the property.

[7] Notably, Perkins-Hooker produced a copy of a second fax at her deposition which she claimed was sent to Yimam the same day. The cover sheet was the same as the original fax, except that the cover sheet had been altered to show that three pages had been faxed instead of just two. Ironically, although the cover sheet showed that three pages were faxed, the fax produced by Perkins-Hooker had only two pages: the cover sheet and a letter. Just as with the original fax, the land description was not attached. Moreover, Perkins-Hooker admitted that she did not know if this second fax had ever been sent to Yimam, and there is no fax transmission data on the pages. According to Yimam, he never received this second fax from Perkins-Hooker's office.

attorney recorded a limited warranty deed with the county showing that Speedway had conveyed both of these parcels to Patel. The same day, Perkins-Hooker recorded the limited warranty deed and the deed to secure debt from Patel's sale of the property to Yimam; the land descriptions attached to the deeds showed that Patel had conveyed only Parcel I to Yimam. It is undisputed that Perkins-Hooker did not send Yimam the altered limited warranty deed after it was recorded with the county.

On November 5, Yimam took possession of the property and began operating the service station. Yimam paid the 2003 and 2004 property taxes for 5.66 acres of land located at "2651 Powder Springs Rd., Powder Springs, GA 30127." In July 2003, however, when Yimam wanted to develop Parcel II, he discovered that the deed filed with the county showed his corporation did not own the parcel.

In a verified complaint, Yimam sued Patel for breach of contract, specific performance, fraud, attorney fees, and punitive damages. Yimam contended that he had negotiated and contracted for the purchase of both parcels of land, that he had paid for both parcels and completed all of his obligations under the contract, and that Patel had wrongfully failed to convey the property. Yimam also claimed that Patel committed fraud by misrepresenting that he (Patel) was conveying both parcels to Yimam, and "by directing [Perkins-Hooker] to record a deed that differed from the parties' agreement and from the deed signed at closing."

Following a bench trial, the trial court found that neither the sales contract nor the closing documents faxed to Yimam before closing contained a legal description of the property to be conveyed. The court ruled that, because the contract lacked a legal description of the property or a "key" sufficient to identify the property being transferred, Yimam was not entitled to specific performance. The trial court also found that, during Yimam's closing on the morning of October 22, 2002,

> Perkins-Hooker notified Yimam of a discrepancy in the property description. Perkins-Hooker had a [bank] representative come into the room and clarify for Perkins-Hooker the precise parcel that was to be sold. The [bank] representative clarified that the parcel to be sold consisted only of [Parcel I] containing approximately 2.1 acres, and not both parcels totaling 5.66 acres. Perkins-Hooker brought the discrepancy contained in the closing documents to Yimam's attention and notified Yimam that she would need to make the necessary corrections to reflect the correct property description as consisting of [Parcel I]. [Perkins-Hooker] showed [Yimam] a plat of the specific property that was to be

conveyed under the sale, which included [only Parcel I]. Without objection, Yimam proceeded with the closing and executed all of the closing documents relating to the purchase of the property and left. . . . Prior to the recording date, Yimam did not notify . . . Patel, in any manner, of Yimam's objection to the closing or the validity of the legal description attached to the limited warranty deed.

Based upon these findings, the court found that the parties had contracted for the sale and purchase of Parcel I, only. Further, the court ruled that the sales contract had merged into the recorded deed and, because Yimam had accepted the deed as recorded, he had relinquished all conflicting claims arising from the sales contract. Regarding Yimam's fraud claim, the court ruled that the claim failed due to the entireties clause in the sales contract. Yimam appeals from the court's order.

1. Yimam contends the court erred in concluding that he was not entitled to specific performance of the sales contract due to the lack of a legal description of the property in the contract or a "key" sufficient to identify the property to be transferred. He argues that, because the court's denial of specific performance was based upon clearly erroneous factual findings and legal conclusions, it must be reversed. We agree.

"The court is the trier of fact in a bench trial, and its findings will be upheld on appeal if there is any evidence to support them." (Citations and punctuation omitted.) *Sheppard v. Sheppard*, 229 Ga. App. 494, 495 (2) (494 SE2d 240) (1997). However, if "the trial court makes a finding of fact which is unsupported by the record, it cannot be upheld; and if the judgment is based upon a fact for which there is no evidence, it should be reversed." (Citation and punctuation omitted.) *Lamar County v. E. T. Carlyle Co.*, 277 Ga. 690, 693 (2) (594 SE2d 335) (2004).

To be valid, a description in a deed, contract for the sale of land, or a claim of lien on real estate must identify the land with reasonable definiteness or contain a key by the use of which the description may be applied by extrinsic evidence. However, a perfect description is not required. All that is required is that the contract furnish a key to the identification of the land. The key relied upon must be sufficient to provide identification by reference to extrinsic evidence which exists at the time that the contract is entered into by the parties. That extrinsic evidence is admissible to show the precise location and boundaries of such tract. The legal sufficiency of a description is a question of law for the court.

(Punctuation and footnotes omitted.) *CDM Custom Homes v. Windham*, 280 Ga. App. 728, 733 (3) (634 SE2d 780) (2006).

(a) As shown above, the sales contract specifically identified the property as "2651 Powder Springs Rd., Powder Springs, GA 30127," and there is no dispute that this address referred to both parcels of land at that time. The flyer that Yimam received from Patel listed the property's address as "2651 Powder Springs Road," and the flyer gave the exact dimensions and square footage of the property. The square footage is consistent with the survey of the property, which included both parcels. All of these documents were in existence at the time the parties executed the contract.

Further, in addition to giving the street address, the contract also specifically referred to Patel's contract to purchase the property from Speedway and was, in fact, contingent upon Patel's acquisition of the property under that contract. The Patel/Speedway contract, in turn, contained a metes and bounds land description of 2651 Powder Springs Road which unmistakably identified the property as two parcels of land totaling 5.66 acres. Patel does not dispute that he contracted to purchase (and later purchased) both parcels from Speedway.

Under these circumstances, the land description in the contract, combined with the language making the sale contingent upon Patel's purchase of the property from Speedway, provided a sufficient key to allow extrinsic evidence to show the exact legal description of the property. See *CDM Custom Homes v. Windham*, 280 Ga. App. at 733 (3) (the contract's land description, which included the property's address, was a sufficient key to allow extrinsic evidence, such as a survey, to show the exact legal description of the property); *Nhan v. Wellington Square*, 263 Ga. App. 717, 721-722 (1) (589 SE2d 285) (2003) (the contract's description of the shopping center to be conveyed as " 'Wellington Square at Indian Trail Lilburn and Dickens Road' " was a sufficient key to allow the court to consider extrinsic evidence to identify the property); see also *Kauka Farms, Inc. v. Scott*, 256 Ga. 642, 643-645 (1) (352 SE2d 373) (1987) (the contract's description of the property as the grantor's home " 'and 20 acres of land immediately surrounding his home' " was a legally sufficient key from which the property could be identified). Thus, the trial court erred as a matter of law in concluding that the contract lacked a legally sufficient land description or key to the identity of the property, and its denial of specific performance of the contract on that basis must be reversed.

(b) Moreover, the court erred in finding as a matter of fact that the closing documents that Perkins-Hooker faxed to Yimam the day before the closing did not contain a legal description of the property. The record clearly shows that these documents referred to the land

description in "Exhibit A," which was attached to each of the documents and specifically described the property as including both Parcels I and II. Further, all of the actual closing documents that were executed by both parties on October 22 contained land descriptions which included both parcels. To the extent the court relied upon a contrary factual finding in denying specific performance, its ruling must be reversed.

2. Yimam contends the trial court erred in finding that the contract of sale had merged into the deed and that he had accepted the deed, thereby relinquishing all conflicting claims in the contract of sale. Specifically, Yimam argues that there was no competent evidence to support the court's factual conclusions that Perkins-Hooker notified Yimam of the mistake in the land descriptions during his closing, that the loan officer confirmed that Yimam was receiving only Parcel I, and that Yimam proceeded with the closing without objection. Yimam also contends there is no evidence to support the court's finding that he accepted the deed without objection after Perkins-Hooker removed the description of Parcel II. Yimam argues that, because such findings are clearly erroneous, the court's rulings that were based upon such findings must be reversed.

(a) In finding that Yimam learned during the October 22 closing that he was buying only Parcel I and that he proceeded with the closing without objection, the trial court apparently relied solely on the trial testimony of Perkins-Hooker. She repeatedly testified that Patel's attorney was present during Yimam's closing and discovered the mistake at that time. According to Perkins-Hooker, after she learned of the mistake, she reviewed the closing documents and survey with Yimam, his wife, and his "entourage," and Yimam agreed that he was purchasing only Parcel I. She testified that Patel's attorney then told her to remove the description of Parcel II from the documents. Perkins-Hooker testified that she immediately left the meeting to get the bank's loan officer, who came into the meeting, confirmed that Yimam's loan was only secured by Parcel I, and consented to her removing the description of Parcel II from the documents. According to Perkins-Hooker, at that point, she "ripped off" the description of Parcel II from the documents, even though Yimam had already signed some of the documents.[8] Perkins-Hooker later admitted, however, that she was having trouble remembering the details of Yimam's closing, including whether Yimam's wife was actually present, because she had conducted several other closings involving Patel that week. She also admitted that "I just don't know

---

[8] As noted above, Perkins-Hooker admitted that she did not have Yimam re-sign the altered documents.

when I removed the [land descriptions of Parcel II]" from the closing documents, and stated that she could not "specifically recall . . . what I did at the actual closing table, to be honest." She acknowledged that the descriptions may have been removed sometime *after* Yimam's closing.

Although Perkins-Hooker's initial testimony supports the court's findings, she later equivocated, admitted that she could not remember the details of the closing and could only speculate about some facts, and even contradicted her own testimony. More importantly, Perkins-Hooker's claim that she learned of the mistake and altered the land descriptions *during Yimam's closing* directly contradicts Patel's own testimony and all of the other evidence in the record, as well as Patel's admissions on appeal, and Patel has offered no explanation for this contradiction. For example, Patel has consistently admitted that the mistake in the land description was discovered *after* — not during — Yimam's closing. Patel also admitted that his attorney notified Perkins-Hooker of the mistake during a meeting some time after October 22 and that Perkins-Hooker *called Yimam on the phone* during the meeting to tell him of the mistake. Obviously, this would have been unnecessary if Yimam was present when the mistake was discovered and the land descriptions were altered, as Perkins-Hooker had claimed. Nor would there have been a need for Perkins-Hooker to send a fax to Yimam on October 28 informing him of a mistake in the closing documents and instructing him to change the legal description attached to the documents. Moreover, the record clearly shows that the Parcel II land descriptions were still attached to the closing documents when Patel signed them, which was *after* Yimam's closing. And the closing documents were still intact when Yimam received them from Perkins-Hooker a few days after the closing. Consequently, Perkins-Hooker could not have removed the Parcel II descriptions during Yimam's closing, as she had originally testified.

As for Perkins-Hooker's testimony that the bank's loan officer confirmed during Yimam's closing that the loan was only secured by Parcel I, the loan officer specifically testified that Yimam's loan was secured by both parcels of the property. The bank's own financing documents and title insurance policy, as well as all of the loan documents executed during Yimam's closing, further establish this fact. The loan officer also denied that Perkins-Hooker brought to his attention any problem about the amount of property being conveyed during Yimam's closing.

Under the circumstances, the court's finding that Perkins-Hooker notified Yimam during his closing that he was purchasing only Parcel I and that Yimam proceeded with the closing without objection is clearly erroneous.

(b) The court also found that, after Perkins-Hooker altered the limited warranty deed, Yimam accepted the deed without objection, and the court ruled that Yimam had thereby relinquished any claims arising from the contract. For the following reasons, the court's ruling must be reversed.

To be valid, a deed must be in writing, signed by the maker, attested by at least two witnesses, supported by consideration, and delivered to the purchaser or his representative. OCGA § 44-5-30; *Jones v. Phillips*, 227 Ga. App. 94, 95 (1) (488 SE2d 692) (1997) (a deed must be properly executed and attested, and does not pass title to the grantee until it is delivered to the grantee or his agent); *Keesee v. Collum*, 208 Ga. 382, 386 (67 SE2d 120) (1951) (the delivery of a deed is complete only when it is in the hands of the grantee or someone authorized to act on his behalf). If a deed is materially altered after it is executed, "the deed to the extent of such alteration has become a new deed, and the alteration may be of such character as entirely to change the original deed. In such a case, to give effect to the alteration, the deed should be reattested and redelivered." (Citations omitted.) *Citizens Bank &c. v. Taylor*, 169 Ga. 203, 210 (149 SE 861) (1929).

Further, under OCGA § 44-2-14 (a), a deed may be recorded only if it has been properly attested or acknowledged. See also OCGA § 44-2-15 (listing officers authorized to attest deeds); *Lionheart Legend v. Norwest Bank Minnesota Nat. Assn.*, 253 Ga. App. 663, 667 (560 SE2d 120) (2002) (a deed that is not properly executed in the manner described in OCGA § 44-5-30 is not recordable); *Duncan v. Ball*, 172 Ga. App. 750, 752 (2) (324 SE2d 477) (1984) (accord). It follows that, if a deed is materially altered after the attestation but before it is recorded, it may not be recorded until it is reattested. *Citizens Bank &c. v. Taylor*, 169 Ga. at 210.

(i) As an initial matter, the record shows that the limited warranty deed Patel signed during his closing was valid and binding between the parties. A written deed which is signed by the grantor, is supported by consideration, and identifies the land being conveyed is valid and binding on the parties, even if the deed is not attested or recorded. OCGA §§ 44-5-30; 44-5-33; *Lionheart Legend v. Norwest Bank Minnesota Nat. Assn.*, 253 Ga. App. at 667; *Duncan v. Ball*, 172 Ga. App. at 752 (2). "Thus, absent evidence of fraud, or duress, or some other coercive action, courts will uphold such unrecorded deeds between the parties." (Footnote omitted.) *Lionheart Legend v. Norwest Bank Minnesota Nat. Assn.*, 253 Ga. App. at 667.

It is undisputed that, when Patel signed the limited warranty deed during his closing on the afternoon of October 22, the Parcel II land description was still attached. Patel admitted that he signed the deed without reading it, and Perkins-Hooker notarized his signature.

Perkins-Hooker then sent a copy of the signed, notarized deed to Yimam, who received it two or three days after the October 22 closing.

Patel does not contend that he is unable to read or that Yimam defrauded him or otherwise prevented him from reading the deed before he signed it. Consequently, Patel's failure to read the deed does not affect the conveyance of title, "for he who can read must read, or show a legal excuse for not doing so, and that fraud which will relieve a party who can read must be such as to prevent him from reading." (Citations and punctuation omitted.) *Beckwith v. Peterson*, 227 Ga. 403, 404 (1) (181 SE2d 51) (1971).

Under the circumstances presented, the original limited warranty deed that Patel executed on October 22 was binding and enforceable against Patel. *Beckwith v. Peterson*, 227 Ga. at 404 (1); see also OCGA § 13-4-1 (if a party or someone acting on his behalf materially alters a written contract after it has been signed, and "the contract as originally executed can be discovered and is still capable of execution, it shall be enforced by the court").

(ii) Although the deed signed by Patel was valid, Perkins-Hooker later materially altered the deed. She did not have Patel re-sign the deed or have the deed reattested in order to effectuate the alteration, nor did she send the altered deed or land description to Yimam. *Citizens Bank &c. v. Taylor*, 169 Ga. at 210. Further, there is no evidence that Yimam ever consented to the alteration, that he ever accepted the altered deed after it was recorded, or that he otherwise agreed to accept only one parcel of land.[9] Given this evidence, the trial court's finding that Yimam should be bound by the altered deed because he accepted it without objection is clearly erroneous.

(iii) Nevertheless, Patel argues that Yimam should be bound by the altered deed because it was constructively "delivered" to Perkins-Hooker *on Yimam's behalf* after it was recorded. See OCGA § 44-5-42 (delivery of deed to a third party as an escrow). Perkins-Hooker represented the bank, however, not Yimam, and there is absolutely no evidence that Yimam had authorized her to accept and retain the recorded deed on his behalf. Perkins-Hooker's possession of the recorded deed, therefore, does not support a finding that the deed was constructively delivered to Yimam. See *Keesee v. Collum*, 208 Ga. at

---

[9] Patel argues, however, that Yimam signed a "Document Replacement Agreement" at closing in which he agreed to correct any "inadvertent errors or omissions" that were discovered after the closing, and, therefore, Yimam was required to accept the alteration of the deed. This argument is without merit. The agreement at issue was between the bank and Yimam, not Yimam and Patel, and was relevant to mistakes in the loan documents only. The agreement stated that, if a mistake was discovered after closing, Yimam agreed to execute new documents or initial corrected documents, as necessary. It is undisputed that the bank never asked Yimam to initial or sign any corrected documents after the closing.

386 (the delivery of a deed is complete only when it is in the hands of the grantee or someone authorized to act on his behalf).

(iv) Patel also argues that Yimam "accepted" the altered deed by failing to object to the recording of the deed after Perkins-Hooker informed him that she had altered the land description. It is undisputed, however, that Patel did not sign the deed after Perkins-Hooker altered it, nor did anyone reattest the deed. Therefore, the altered deed was ineligible for recordation under OCGA § 44-2-14 (a), and should not have been recorded in this case. *Citizens Bank &c. v. Taylor*, 169 Ga. at 210. Further, Yimam never received a copy of the altered deed or land description before or after it was recorded. Under the circumstances, Yimam's failure to object to the recording of the altered deed does not support the court's finding that he accepted the deed without objection.

3. Accordingly, having found that the sales contract contained an adequate legal description that included both Parcels I and II,[10] that the original limited warranty deed signed by Patel on October 22 and delivered to Yimam conveyed both parcels and was legally valid and enforceable between the parties,[11] and that there was no evidence that Yimam accepted the altered deed without objection,[12] we conclude that Yimam was entitled to specific performance of the contract as a matter of law. We reverse the trial court's judgment and remand the case with direction for the court to enter judgment in favor of Yimam.

*Judgment reversed and case remanded with direction. Johnson, P. J., and Miller, J., concur.*

DECIDED OCTOBER 13, 2006 —
RECONSIDERATION DENIED NOVEMBER 1, 2006.

*Miller & Martin, Bryan M. Cavan, Jennifer B. Grippa*, for appellant.
*Mills & Moss, Steven M. Mills*, for appellee.

---

[10] See Division 1 (a), supra.
[11] See Division 2 (b) (i), supra.
[12] See Division 2 (b) (ii)-(iv), supra.